UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, § | |
| § | |
| *Plaintiff*, § | |
| § | |
| v. § | Case No. 22-CR-614-XR |
| § | |
| MAURICE LAMONT BAKER, § | |
| § | |
| *Defendant*. § | |

**ORDER**

On this day came on to be considered Defendant's motion to suppress (Dkt. No. 24). Defendant is charged with two counts in this case: felon in possession of a firearm and possession with intent to distribute 50 grams or more of methamphetamine. Baker argues that his vehicle was searched without a warrant and that he encountered a custodial interrogation without first being given his *Miranda* warnings.

**BACKGROUND**[1]

**I.     Facts**

   **a.     Pre-Stop**

On October 19, 2022, at approximately 2:02 a.m., New Braunfels Police Department ("NBPD") Officer Crawford was patrolling the 4100 block of Loop 337 in New Braunfels, Texas. Dkt. No. 1 at 1; Dkt. No. 24 at 2. While conducting an unrelated traffic stop at the Pilot Travel Center on Loop 337, Officer Crawford observed a Chevrolet Tahoe in the same parking lot with a dark window tint and after-market bumper and lighting packages. At first Officer Crawford thought the vehicle was a police vehicle, but then he noted the vehicle license plates did not

---

[1] Unless otherwise indicated, these facts are from the dashboard and body camera footage submitted as Government's exhibits at the hearing held on March 7, 2023.

1

conform to an unmarked police vehicle. Dkt. No. 24 at 2–3. Officer Crawford noted the Tahoe's atypical parking position and Defendant's atypical behavior, which included approaching but never entering the store. *Id.*; Dkt. No. 1 at 1.

Officer Crawford ran the Tahoe's license plates to check the vehicle's registration which revealed the plates were assigned to a red 2018 Kia Sorrento. Dkt. No. 24 at 3. The Tahoe exited the parking lot onto Loop 337. *Id.* As the Tahoe made a left-hand turn onto Altgelt Road, Officer Crawford initiated a traffic stop.[2] Gov't Ex. A at 0:01:00.

### b. Immediately After the Stop and Defendant's Detainment

While standing outside his own vehicle, Officer Crawford instructed Defendant to exit the Tahoe. *Id.* at 0:01:43. Defendant exited the vehicle with his hands raised and while talking to someone on the phone. *Id.* at 0:02:03. Officer Crawford instructed Defendant to walk away from his vehicle towards the squad car. *Id.* at 0:02:27; Gov't Ex. B at 0:01:36. Defendant left his door open and as he began to comply with Officer Crawford's instructions, Officer Crawford handcuffed Defendant. Gov't Ex. A at 0:02:41; Gov't Ex. B at 0:02:23. Officer Jarzombek approached the open door and looked into the Tahoe. Gov't Ex. A at 0:02:52; Gov't Ex. C at 0:02:45.

As Officer Jarzombek checked the Tahoe for its VIN/registration number, Officer Crawford brought Defendant to the squad car. Gov't Ex. A at 0:03:12; Gov't Ex. C at 0:02:52. During the walk, Defendant repeatedly said he was going to jail. Gov't Ex. B at 0:02:57, 0:03:44. Defendant informed Officer Crawford the license plates belonged to a female friend of his. *Id.* at

---

[2] Officer Crawford contended that the Defendant attempted to elude him by passing "several safe areas to pull over" and that the Defendant only stopped because of a train blocking the roadway. Dkt. No. 1 at 2. Defendant claims he "traveled a short distance before coming to a full stop." Dkt. No. 24 at 3.

0:03:37.³ As Officer Crawford spoke with Defendant, Officer Jarzombek shined his flashlight through the Tahoe's back windows. Gov't Ex. A at 0:03:47.

Defendant informed Officer Crawford he had a warrant in Bell County. Gov't Ex. B at 0:04:00. When asked if there was anything illegal in the Tahoe, Defendant responded with "a whole bunch of guns." *Id.* at 0:04:07; Gov't Ex. C at 0:04:08. Defendant clarified that there was a "223 and a '55" in the Tahoe. Gov't Ex. B at 0:04:49.

Officer Crawford asked Defendant if he is a felon, and Defendant responded: "Probably so." Gov't Ex. B at 0:04:51; Gov't Ex. C at 0:04:49. Defendant then volunteered he "was ready to die" and that if the officers had pulled a gun on him, things would have gone much differently. Gov't Ex. B at 0:05:11, 0:09:45. Officer Jarzombek returned to the open door and picked up an item from inside the vehicle. Gov't Ex. A at 0:05:00; Gov't Ex. C at 0:05:15.⁴ Officer Jarzombek read a number from the item to the dispatcher. Gov't Ex. A at 0:05:24; Gov't Ex. C at 0:05:20.

### c. Search #1: Finding the Rifle & Handgun

Officer Crawford returned to the Tahoe and looked inside the open door with his flashlight before opening the back driver-side door to look within. Gov't Ex. A at 0:08:24; Gov't Ex. B at 0:08:20. Officer Crawford then walked around the vehicle to the other side and opened the front passenger-side door where he immediately saw a rifle. Gov't Ex. B at 0:08:31. Officer Crawford removed the rifle from the Tahoe. *Id.* at 0:08:45.

After Officer Crawford left the Tahoe, Officer Jarzombek returned to the passenger-side and searched the Tahoe through the back passenger-side door. Gov't Ex. A at 0:09:57; Gov't Ex. C at 0:09:47. Officer Jarzombek removed a handgun from the Tahoe and placed it in his squad car.

---

³ Defendant told officers that when he bought the vehicle, the seller did not include the bill of sale, precluding the purchase of new license plates. *Id.* at 0:07:45.
⁴ The item appears to be Defendant's wallet and driver's license.

Gov't Ex. A at 0:11:26; Gov't Ex. C at 0:11:09. As Officer Jarzombek searched the Tahoe, Officer Crawford searched Defendant's pockets and placed him in the squad car. Gov't Ex. B at 0:12:28. Officer Crawford joined Officer Jarzombek at Officer Jarzombek's squad car while Officer Jarzombek had the handgun. Gov't Ex. C at 0:13:05. Officer Jarzombek read the serial numbers on the handgun and the rifle to the dispatcher. Gov't Ex. C at 0:14:08, 0:17:53.

### d. Search #2

Defendant told Officer Crawford if he had been in Bell County, he would have shot the officers that tried to pull him over.[5] Gov't Ex. A at 0:16:04; Gov't Ex. B at 0:15:52. While Defendant is restrained and in the squad car, he told Officer Crawford there was another loaded gun in the Tahoe. Gov't Ex. B at 0:17:29. The dispatcher informed Officer Crawford there were two warrants for Defendant's arrest. *Id.* at 0:18:35.

After Officer Crawford finished his conversation with Defendant, he relayed to Officer Jarzombek that there was another gun in the Tahoe. Gov't Ex. C at 0:22:22. Officer Crawford walked around the squad car, took his body camera off, and placed it on the hood of the squad car. Gov't Ex. B at 0:24:49. Officer Crawford then returned to the Tahoe to search it further while talking to someone on the phone. Gov't Ex. A at 0:28:25; Gov't Ex. B at 0:24:55. Officer Crawford walked around to the front of the Tahoe multiple times where he could not be seen and returned to the front driver-side door periodically. Gov't Ex. B at 0:25:01–28:04. He eventually came back, picked up his body camera, and returned to the Tahoe. Officer Crawford searched the Tahoe through the rear driver-side door and looked inside multiple shoe boxes. *Id.* at 0:29:54.

---

[5] Defendant talked about past actions by police where they would run up to a vehicle with guns drawn and how he would have felt threatened if that had happened in this case. Gov't Ex. A at 0:16:59; Gov't Ex. B at 0:16:48. The Government interprets this conversation as Defendant's willingness to harm law enforcement officers; Defendant claims he was expressing his apprehension and fear of law enforcement. *Compare* Dkt. No. at 3, *with* Dkt No. 24 at 3.

Officer Crawford left for a brief period but shortly thereafter returned to the Tahoe with Officer Jarzombek (roughly 30 seconds later) to continue searching. Gov't Ex. A at 0:29:57. Officer Crawford opened the rear door to search the back, which was full of shoe boxes. *Id.* at 0:30:47; Gov't Ex. B at 0:30:40. Officer Jarzombek searched the front driver-side part of the Tahoe. Gov't Ex. C at 0:31:30.

Officer Crawford searched the front passenger-side door, the glovebox, and the items in the front seat. Gov't Ex. B at 0:32:36. While searching a bag in the front-passenger seat, Officer Crawford found a scale and mentioned "there might be some drugs in here." *Id.* at 0:35:26. Officer Jarzombek continued to search through the shoe boxes, sometimes even the shoes themselves. Gov't Ex. C at 0:40:00. After Officer Crawford found a gun in the front middle compartment, he told Officer Jarzombek: "He says there's another gun, I just don't know where it's at." Gov't Ex. B. at 0:40:09. Officer Crawford returned to Defendant and asked him if he only had the two guns ("the AR and the Ruger?"). *Id.* at 0:41:17. Defendant answered in the affirmative. *Id.* at 0:41:22.

e.   **Search #3**

Officer Crawford returned to the Tahoe where he and Officer Jarzombek continued to search. *Id.* at 0:41:39. While searching a smaller case containing Nintendo Switch controllers, Officer Crawford found a small baggie containing a white substance. *Id.* at 0:41:46. Officer Crawford showed the bag to Officer Jarzombek, believing they were drugs, and immediately returned to speak with the Defendant. *Id.* at 0:42:10.

f.   **Defendant Mirandized**

After finding the meth and guns, Officer Crawford returned to the squad car and read *Miranda* warnings to the Defendant. Gov't Ex. A at 0:42:22; Gov't Ex. B at 0:42:28. While Officer Crawford read the *Miranda* warnings, Officer Jarzombek continued to search the Tahoe. Gov't

Ex. C at 0:42:26. Defendant admitted to Officer Crawford he sold meth to "people everywhere." Gov't Ex. A at 0:43:16; Gov't Ex. B at 0:43:06. Defendant told Officer Crawford he had at least "20 keys." Gov't Ex. B at 0:43:28.

## ANALYSIS

### I. Probable Cause Existed for the Stop of the Vehicle

Officer Crawford had probable cause, and reasonable suspicion, to stop Defendant's vehicle. Officer Crawford found the Tahoe's license plates were registered to another vehicle, in violation of state law. TEXAS TRANSP. CODE § 504.945. Upon stopping him, officers could lawfully order the Defendant to exit the vehicle and handcuff him for safety reasons based on the circumstances. The Court notes the nighttime hours this event took place and the somewhat rural setting. *See, e.g.*, *United States v. Earthman*, 995 F. Supp. 2d 579, 586 (N.D. Tex. 2014). Further, this did not automatically convert Defendant's detention into an arrest. *See United States v. Walker*, No. H-20-222, 2021 WL 951665, at *11 (S.D. Tex. Mar. 12, 2021). The NBPD Officers could also lawfully check whether Defendant had active warrants and continue to detain him pending those results. *See United States v. Lopez-Moreno*, 420 F.3d 420, 430-31 (5th Cir. 2005).

### II. No Impermissible Interrogation Occurred Initially

For the first 15 minutes or so of the stop, the Defendant volunteered that (1) he was going to jail, (2) the improper license plates belonged to a female friend, and (3) he had outstanding warrants. When asked if he had anything illegal in the car, the Defendant stated that he had a "bunch of guns." When asked whether he was a felon, the Defendant stated, "probably so." The Defendant then started a conversation with Officer Crawford about how he had contemplated a shootout if the traffic stop had been conducted differently. The first three statements by the

Defendant were volunteered by him, and accordingly there was no improper interrogation related to those statements.[6]

At this time Officer Crawford knew that the Defendant's vehicle did not have a valid set of license plates and the Defendant had volunteered that there outstanding warrants for him. Officer Crawford accordingly may have prolonged the detention to verify the identity of the Defendant, whether the vehicle was stolen, and whether there indeed were warrants for the Defendant's arrest. *United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010) ("If the officer develops reasonable suspicion of additional criminal activity during his investigation of the circumstances that originally caused the stop, he may further detain [the] occupants [of the vehicle] for a reasonable time while appropriately attempting to dispel this reasonable suspicion.").

Based on the above statements and the volunteered admission that he had arrest warrants outstanding, Officer Crawford asked if anything illegal was in the car. At this time even though the Defendant was handcuffed for officer safety, he was not in custodial arrest for *Miranda* purposes. *See, e.g., United States v. Sullivan*, 138 F.3d 126, 132 (4th Cir. 1998). Accordingly, Defendant's motion to suppress his admission of possessing weapons in the vehicle is denied.

III.  **Did Exigent Circumstances Allow for the Search of the Vehicle?**

The Government argues that "NBPD lawfully seized the assault rifle and handgun from Defendant's vehicle, both of which were in plain view." The Government argues that this was appropriate for officer safety, given that Defendant was still standing near his vehicle while he was detained, and because he had volunteered several statements about potentially shooting the officers. The Court disagrees. The Defendant was already handcuffed and removed to the patrol car when a search of the vehicle began. It is also less than clear that the rifle and handgun were in

---

[6] The Court rejects the arguments made in the Defendant's Post-Hearing Brief that excessive force and impermissible tactics were used by the police then. These arguments are undercut by the video recordings.

plain view. When the officers peered into the driver seat area, no mention was made that either of them saw a rifle in the front passenger area. It was not until the front passenger door was opened that the rifle was clearly seen. It took several minutes of searching the back seat areas before any handgun was located. The Defendant was handcuffed and well removed from his vehicle during this time and accordingly no exigent circumstances existed for any warrantless search to occur. The Government has also failed to explain why searches for any drugs fell under the exigent circumstances exception given the facts here.

IV. **Inventory Search**

Finally, the Government argues that since the Defendant was arrested for his outstanding warrants, the weapons and drugs should not be suppressed because they would have been inevitably discovered when an inventory search of the vehicle would have been conducted. The Court agrees on this issue. "[A]n inventory search of a seized vehicle is reasonable and not violative of the Fourth Amendment if it is conducted pursuant to standardized regulations and procedures that are consistent with (1) protecting the property of the vehicle's owner, (2) protecting the police against claims or disputes over lost or stolen property, and (3) protecting the police from danger." *United States v. McKinnon*, 681 F.3d 203, 209 (5th Cir. 2012); *see also United States v. Walker*, No. CR H-20-222, 2021 WL 951665, at *13 (S.D. Tex. Mar. 12, 2021), *aff'd,* 49 F.4th 903 (5th Cir. 2022) (citing Fifth Circuit cases that discuss evidence obtained from an illegal search of a vehicle was nevertheless admissible because it would inevitably have been discovered in an inventory search).

V. **Post-*Miranda* Statements**

After he was administered his *Miranda* warnings, Defendant continued to volunteer statements to the officers. No inappropriate tactics were employed by the law enforcement officers. *See United States v. Fernandez*, 48 F.4th 405, 411 (5th Cir. 2022).[7]

## Conclusion

Defendant's motion to suppress (Dkt. No. 24) is **DENIED**. The weapons and drugs would have inevitably been discovered in an inventory search. The first statements (first 15 minutes of stop) by the Defendant were volunteered by him, and accordingly there was no improper interrogation related to those statements. After he was administered his *Miranda* warnings, Defendant continued to volunteer statements to the officers. No inappropriate tactics were employed by the law enforcement officers. Even if the Court were to suppress any statements made by the Defendant in the in-between period, the suppression would be meaningless given that the weapons and drugs would be later discovered during an inventory search.

It is so **ORDERED**.

**SIGNED** May 3, 2023.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

---

[7] Defendant also raises in his post-Hearing Brief an argument that the police officers engaged in an impermissible two-step interrogation technique to undermine the *Miranda* warnings. The Court rejects that argument as well. The "circumstances, nature, and tone of the questioning" do not come even close to suggesting that coercion or other improper tactics were used. *See United States v. Gonzalez*, 814 F. App'x 838, 847 (5th Cir. 2020). Throughout their encounter, the Defendant and Officer Crawford were frankly open and honest with each other. Defendant immediately admitted to his warrants and bad license plates and thoughts about shooting the officers, and Officer Crawford expressed relief that the encounter had not gone astray. The encounter never changed demeanor throughout.